Filed 8/6/21  C.B. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| C.B. et al.,<br><br>    Petitioners,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G060148<br><br>(Super. Ct. No. 20DP0088)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Barry T. LaBarbera, Judge.  (Retired judge of the San Luis Obispo Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Petition denied.

Juvenile Defenders and Donna P. Chirco for Petitioner C.B.

Martin Schwarz, Public Defender, Seth Bank, Assistant Public Defender and Brian Okamoto, Deputy Public Defender for Petitioner Miguel R.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Office of Harold LaFlamme and Amy Prosser for Real Party in Interest Michael R.

\*         \*         \*

## INTRODUCTION

C.B. and Miguel R., the parents of the minor Michael R., have petitioned to set aside the juvenile court's order terminating family reunification services and setting the matter for hearing under Welfare and Institutions Code section 366.26.[1]  They assert that the juvenile court did not have substantial evidence to support its finding of detriment to Michael if he were placed with them and that they did not receive reasonable reunification services.  Miguel also maintains he should have received more reunification services or a continued hearing.

We deny the petition.  The juvenile court had substantial evidence to support its decision the provided reunification services were reasonable and no additional services were called for.  Its conclusion that placing Michael with his parents at this point would be detrimental to him is also supported by substantial evidence.

## FACTS

Michael, born in January 2020, tested positive for methadone at birth, as did C.B.  He spent the first weeks of his life withdrawing from methadone, with symptoms severe enough to require morphine.  He remained in the hospital neonatal

---

[1]     All further statutory references are to the Welfare and Institutions Code.

intensive care unit (NICU) because of his withdrawal symptoms until going to an emergency shelter in February.[2]

Although initially denying illicit drug use, C.B. eventually admitted to a history of heroin abuse. She had also recently overcome an alcohol addiction that required rehabilitation. C.B. was arrested in March 2019, along with Miguel, for possession of a controlled substance and began methadone treatments in October 2019. She was still using drugs illegally at that point and continued using them until the end of November although she was pregnant with Michael. Miguel also had an extensive arrest record for drug- and alcohol-related offenses.[3] He tested positive for morphine and opiates in late January 2020.

A protective custody warrant was issued on January 16, 2020. In February 2020, visitation was increased from 8 to 10 hours weekly, supervised. The court assumed jurisdiction over Michael on June 1.

The services SSA offered at the beginning of the case were substance abuse treatment, drug testing, residential treatment, individual counseling, and referrals to family resource centers. C.B. stated she was already enrolled in a treatment program (the methadone clinic) and in individual counseling (the clinic). Miguel also stated he was enrolled in the methadone clinic and getting individual counseling there.

The Orange County Social Services Agency (SSA) reported C.B. and Miguel to be highly "motivated in services" and "highly engaged" at the end of January 2020. C.B. stated that she needed to "stay in communication [with] my social worker"; Miguel needed "to complete all requirements being asked of me."

---

[2]     Michael was still exhibiting withdrawal symptoms in March 2020.

[3]     In an initial interview, Miguel told the case worker he did not have any criminal history after 2017 and that he was last arrested for trespassing at a skate park. A search of the records turned up an arrest for possession of heroin in September 2019.

3

In February 2020, Miguel reported that he and C.B. were living with his mother. Visits were going well, and they were happy with Michael's caretaker. Miguel said he had signed up for anger management classes and was attending Narcotics Anonymous sessions twice a week. The case worker asked for attendance cards, and Miguel agreed to provide them. Michael's caretaker reported that they visited frequently in late February and early March. C.B. and Miguel were also on track with their drug testing in February and March. They were "very motivated" about visitation and were "utilizing their full hours."

In-person visitation at the caretaker's home was suspended in March 2020, due to the pandemic so visits with Michael took place in a park, with appropriate precautions. On March 31, even these in-person visits were suspended, because of the pandemic. The caregiver offered to set up video chats, but the parents often did not respond to her efforts to set them up, and, as of mid-April, there had been only two chats for about 10 minutes each.

At the end of April 2020, Michael was placed with Miguel's sister, Christine, in Rialto. Christine said she was shocked to discover Michael was in the NICU because of drugs; Miguel and C.B. had told her he had a congenital heart defect. They told Miguel's mother the same thing.

When contacted regarding the new visitation schedule in Rialto, the parents told SSA they had transportation to Christine's home. They confirmed in May that transportation was not an issue. If there were no trains, they could afford an Uber, since they both now had jobs. SSA offered them train passes if necessary.

In May, Christine began to express worries about the prospects of reunification. She reported that Miguel had canceled a visit because he had to drug test

4

and that C.B. appeared to be under the influence of alcohol at a recent visit.[4] In early May, Christine reported visits were becoming difficult because C.B. and Miguel tried to leave with Michael, take him into another room, or "'do whatever they want'" despite the court's order that visits be supervised. They also began canceling visits, at times complaining about train schedules or having to drug test. Other times they went out when they were supposed to be visiting. SSA told them that the drug testing schedule could be modified to accommodate visiting and the visits were very important. It was emphasized that canceled visits could not be made up.

Miguel's family also became reluctant to talk to SSA, fearing that he would find out what they said and hold it against them. Miguel's mother reported that when he began dating C.B., his drug problem increased, he lost his job, and he became homeless. She refused to let them live with her while they were doing drugs. They had been living with her since October 2019, but she had told them that they had to move out, as she did not get along with C.B. In addition, they were drinking 24-ounce cans of beer.

In May 2020, both C.B. and Miguel were given telehealth counseling appointments with Casa Familia, the appointments to start on May 27. C.B. quit after one session because she "does not speak Spanish." She had three appointments scheduled in June, but did not show up for any of them. Besides, she said, she was seeing a counselor at the methadone clinic. The case worker asked C.B. to have counselors contact her, and C.B. agreed but did not follow through. The case worker again asked C.B. to have her counselors call or email SSA in July. Again, nothing. The case worker once more asked for a call from C.B.'s counselor in August. When C.B. complained about Casa Familia being Hispanic (she needed a facility she "can pronounce"), the case

---

[4]      Both parents were supposed to abstain from alcohol, but they continued to test positive for it. At first they denied drinking, but eventually admitted that they were having wine and beer with meals. When told of her positive alcohol tests, C.B. opined that it was "not a big deal" to have alcohol with meals.

worker sent her counseling options in September and a list of places for conjoint therapy. C.B. did not respond.

C.B. and Miguel moved into Illumination Foundation in Anaheim in July. C.B. claimed they were not allowed to leave the facility to drug test or visit, so they were missing appointments for both. The case worker contacted the facility manager, who said they had always been able to go to drug tests with a facility driver.

The missed visits increased in July and August, with the addition that sometimes the parents would simply not show up – without notice. Christine reported she had seen posts that the parents were out and about doing other things when they were supposed to be visiting. When they did show up, they often left before the visit was over.

In August, the case worker asked for confirmation that C.B. had completed her parenting course. She agreed to send this information. Instead, she sent information of a course primarily focused on breastfeeding that she took before Michael was born.

During the monthly compliance contact in August, the case worker told C.B. that she needed improvement with drug testing, visitation, and self-help meetings. The recommendation to continue services depended on improving in these areas. C.B. said she understood. The case worker told both parents the same thing at a visit in August.

The pattern was the same with Miguel during these months. The case worker asked to have Miguel's counselors at the methadone clinic contact her to verify his progress, to no avail. He showed the case worker the same pre-birth parenting course that C.B. had sent her. He claimed he could not leave Illumination Foundation for drug tests. He missed visits. He claimed Christine had refused to alter the visitation schedule to accommodate his testing; she denied he had ever asked her to do this.

The case worker provided Miguel with a housing referral in August 2020. In February 2021, C.B. and Miguel told SSA they had moved and they did not want a housing referral.

6

Miguel and C.B. did not respond to repeated request to schedule their monthly compliance contact with SSA in September and October. Between September 16 and October 22, C.B. and Miguel visited Michael once out of 21 scheduled visit days. Between the end of October and the end of December, they visited on 6 of 33 scheduled visit days.

As of November, Miguel's counselor at the methadone clinic had told SSA that he did not provide individual counseling. C.B. stated that she would find her own provider through her insurance. Christine reported that C.B. and Miguel had lost their jobs and were no longer living at Illumination Foundation. They had not provided SSA with any updates since August 20. SSA recommended no further services considering the parents' "level of engagement in their case plan services, lack of proven sobriety, inconsistent visitation, and lack of providing a safe and stable environment." They summed it up as, "They are not testing, visiting, or communicating with [SSA] on a consistent basis."

In February 2021, the case worker again asked C.B. to have her counselor (apparently a new one) contact SSA and to provide a phone number for the counselor. The case worker received neither a phone number nor a call from the counselor. Likewise, the case worker did not receive confirming documents regarding C.B.'s online parenting education class.

In early February, the case worker inquired into C.B.'s participation in a substance abuse outpatient program. C.B. replied that the methadone clinic counseling was an approved outpatient program. The program did not qualify, however, because there was no group component.

It was clear to the court as of April 2021 that Michael could not then be placed with his parents. They did not have stable housing or employment. They were still taking doses of methadone – as C.B. had been doing when Michael was born – with

7

no end in sight, indicating to the court that the drug problem had not been resolved.[5] They knew they were not supposed to be drinking, but they tested positive for alcohol and were, as the court observed, "minimiz[ing] it." Their visitation had been inconsistent. More importantly, it was steadily deteriorating.

Where the juvenile court struggled, however, was with the question of terminating services or giving the parents more time to comply. On the one hand, both Miguel and C.B. had started off well. Then the pandemic had struck, interfering to some extent with their ability to visit and test. And the court acknowledged that both parents had made progress with the immediate problem leading to detention – illegal drug use.

On the other hand, they had not been visiting consistently, especially as time wore on, and they had not availed themselves of the required services, other than sporadic drug testing. They habitually promised to send verification of their case plan activities to SSA without following up, and they maintained only intermittent contact with their case worker.

Ultimately the court was not persuaded their problems would be resolved within the time necessary to bring the case within the ambit of section 366.21, subdivision (g)(1).[6] The court was mindful of the restricted timeline for reunification

_____

[5] In March 2020, the program manager of the methadone clinic told SSA that the program was a maintenance program. "'We have counselors available, but we do strictly methadone maintenance, we're not an outpatient or intensive program. . . . [Patients] can be on maintenance for decades if they want to.'"

[6] Section 366.21, subdivision (g)(1), provides, in pertinent part, "If the time period in which the court-ordered services were provided has met or exceeded the time period set forth in subparagraph (A), (B), or (C) of paragraph (1) of subdivision (a) of Section 361.5, as appropriate, and a child is not returned to the custody of a parent . . . at the permanency hearing held pursuant to subdivision (f), the court shall do one of the following: [¶] (1) Continue the case for up to six months for a permanency review hearing, provided that the hearing shall occur within 18 months of the date the child was originally taken from the physical custody of his or her parent . . . . The court shall continue the case only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent . . . and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent . . . . For purposes of this section, in order to find a substantial probability that the child will be returned to the physical custody of his or her parent . . . and safely maintained in the home within the extended period of time, the court shall be required to find all of the following: [¶] (A) That the parent . . . has consistently and regularly contacted and visited with the child. [¶] (B) That the parent . . . has made significant progress in resolving problems that led to the child's removal from the home. [¶] (C) The parent . . . has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs."

with a child of Michael's age; it was particularly concerned that Miguel and C.B. had not consistently visited Michael and had not demonstrated their willingness to complete the objectives of the case plan, although they had the ability to do so. The court found that both parents had made minimal progress in alleviating the conditions leading to Michael's removal. It also found that SSA had offered the parents reasonable services.

The court compromised with a "soft .26," meaning that although the court terminated reunification services and set the hearing under section 366.26, it authorized SSA to continue funding services such as testing and counseling so long as the parents did not have a positive or diluted test or did not turn up for counseling. The hope was that the parents would buckle down and work the plan, enabling them to show changed circumstances to support a section 388 motion before the section 366.26 hearing.

Both parents have separately petitioned this court for a writ to set aside the court's ruling terminating their services.

## DISCUSSION

In this case, we must examine two points in time. The first is the showing made by SSA in April 2021 to support termination of reunification services. At that point, did SSA carry its burden to prove substantial risk of detriment to Michael by preponderance of the evidence if he were placed with his parents?[7] And did SSA make a showing by clear and convincing evidence that it had offered reasonable services as of April 2021? The other point in time is in the future. Did the court err by not giving Miguel and C.B. more time to complete their services?

## I.        Reasonable Services

Although the juvenile court found otherwise, Miguel and C.B. both maintain that SSA did not show that it provided reasonable reunification services. C.B. argues that SSA did not timely inform her that her drug treatment program (the

---

[7]        "Returned" is not an accurate term; Miguel and C.B. never had custody of Michael.

9

methadone program) did not comply with the substance abuse treatment component of her service plan. Miguel maintains that SSA made minimal efforts with respect to transportation and housing and did not timely inform them that their drug counseling program was inadequate. We review the court's finding of reasonable services for substantial evidence, keeping the clear-and-convincing-evidence standard in mind. (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238-1239; § 366.21, subd. (g)(1)(C)(ii).)

The trial court found that SSA had offered both parents reasonable services and that both parents demonstrated a "lack of engagement" with the services they were offered. While not minimizing the effects of the pandemic, the court determined the parents "were given the reunification advisement initially of what would happen if they didn't engage, and they didn't. And they do have a responsibility to do so."

The record as a whole supports the trial court's characterization of the parents' attitude toward their services. The record reveals consistent patterns of broken promises, unsubstantiated excuses, and failures to follow up that cannot be solely attributed either to the pandemic or to what Miguel calls their "impoverished circumstances." A few examples will demonstrate what the court had before it.

The parents' case plans services were general counseling, parenting education, substance abuse testing, 12-step programs, and substance abuse outpatient services. Miguel's plan also included anger management services. In addition, they were required to have monthly meetings with their case worker to monitor their progress.

When Michael went to Christine's home, SSA offered train passes so that the parents could visit him in Rialto. Both C.B. and Miguel repeatedly told SSA that transportation to Rialto was not a problem.[8] In January 2021, SSA gave them train passes until clashes with Christine caused visitation to be moved to Orange County. SSA

---

[8] This was due, in part, to the fact they felt their "impoverished circumstances" were not so dire as to render Uber unaffordable.

10

gave Miguel a housing referral in August 2020; when another was offered in February 2021, both parents said they did not need it.

C.B. and Miguel simply did not do their part. They promised to send their case worker evidence of their compliance with portions of their case plan, such as a 12-step program, but did not do so. The same was true of evidence of employment. They told their case worker quarantine restrictions at their drug treatment facility prevented them from drug testing; it turned out there were no such restrictions. They made appointments to speak to their case worker which they did not keep and did not try to reschedule. They told their case worker they had repeatedly called the drug patch site and got a busy signal or a machine; the case worker called, got a person on the line immediately, and was told that the facility did not have a machine. Nor was there any record of either parent trying to call.

They told their case worker they were getting counseling through their methadone clinic; the case worker asked for contact information and phone calls from the counselors to ascertain what the program entailed. No such information was forthcoming. In November 2020, SSA reported to the court that the parents "are not testing, visiting, or communicating with [SSA] on a consistent basis." The case worker again asked for the contact information for their counselor in February 2021 but received no contact information or the promised phone call from the counselor himself.

Both C.B. and Miguel zero in on the fact that there was confusion about whether their methadone program qualified as fulfilling the substance abuse outpatient portion of their case plan. They maintain they were not told until the last minute that it did not.[9]

The record shows that SSA repeatedly sought information, beginning as early as July 2020, about the kind of counseling both C.B. and Miguel were obtaining

_____

[9] The parents' case worker told them that the methadone program was not a substance abuse outpatient program on February 4, 2021. C.B. disputed this information.

11

through the methadone program, counseling they both claimed fulfilled this part of their case plan. Numerous requests to both the parents and the clinic for phone calls from counselors elicited no response. C.B. was referred to Casa de la Familia for counseling in May 2020, but she never communicated with the provider. She said she would find her own therapist. As of November 23, 2020, the SSA report stated that the methadone clinic did not provide general counseling, and Miguel's "counselor" reported that he did not provide therapy.

Because no one communicated with SSA about the counseling services offered at the methadone clinic until very late in the day, SSA had no way to verify whether the services qualified under the case plans. Miguel and C.B. repeatedly promised to give SSA their counselors' contact information and to have their counselors call their case worker. Months went by. No calls, no contact information. If the parents had responded to these repeated requests in the summer of 2020, they would have had plenty of time to get into an approved counseling program. As the court stated, they were told what would happen if they did not engage. And they didn't.

But the court did not base its decision solely on the drug counseling program. In fact, continued illegal drug use was not one of the court's major considerations, although it was uneasy about the parents showing no sign of getting off methadone. The court was more concerned by the parents' failure to visit, which made them virtual strangers to a child as young as Michael.[10] The other major consideration was the failure to engage in services, of which drug counseling was only a portion. The court was much more concerned about their low drug testing rates than it was about whether they were getting counseling. Failure to supply proof of compliance with

---

[10] Miguel and C.B. did not show up for visits for two months between January and March 2021. Between the end of October and the end of December 2020, they visited 6 times out of a possible 30 plus times. They claimed that they could not video visit because Christine did not have Zoom, when they knew full well that she did. The case worker tried to schedule Zoom visits, but the parents did not respond. These would not be considered reasonable efforts to buy a television set, much less connect with a child.

12

requirements such as their 12-step program loomed much larger in the court's calculus than group counseling.

We conclude that substantial evidence supports the juvenile court's ruling that SSA offered reasonable services to C.B. and Miguel. They just chose not to take advantage of them

## II.        Detriment

Both parents maintain the juvenile court did not have sufficient evidence to support a finding of detriment to Michael or substantial risk to him if he were placed with them.

Section 366.21, subdivision (e)(1), provides in pertinent part, "At the review hearing held 6 months after the initial dispositional hearing, but no later than 12 months after the date the child entered foster care as determined in Section 361.49, whichever occurs earlier, after considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment. . . . The failure of the parent . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental."

"We review the juvenile court's finding of detriment for substantial evidence. [Citations.] Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court." (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864-865.)

13

As the discussion of reasonable service demonstrates, Miguel and C.B. failed to participate regularly and make substantive progress in their treatment programs, thereby providing prima facie evidence that placing Michael with them as of April 2021 would be detrimental. In addition, the court was concerned about their residence in a shelter and lack of employment.[11] The court was also troubled that both parents were still on methadone.

The parents visited only sporadically and frequently did not even phone to let either Christine or SSA know when they would not be attending a visit. For a child of Michael's age, this inconsistency necessarily led to a bond with another caretaker instead of with them. At one point in early March, Miguel was holding Michael at the end of a visit when Michael reached for Christine, calling her "mama." Miguel became upset with Michael and told him not to call Christine mama. This was after he had supposedly completed his anger management program.

The juvenile court had substantial evidence to support its conclusion that placing Michael with Miguel and C.B. as of April 2021 would create a substantial risk of detriment to him, in addition to the prima facie evidence created by their failure to participate and make substantial progress. This failure, coupled with their visitation history, showed that they were not prepared to become Michael's full-time caregivers.

## III. Termination or Continuation of Reunification Services

Although the court was unequivocal about its decision not to place Michael with Miguel and C.B. as of April 2021, it struggled with – in fact, agonized over – whether to terminate or extend reunification services. Ultimately it decided not to extend them because "[t]he problem there is I don't know if I can say right now, after a year of what's been going on, that there is a substantial probability the child will be returned within six months."

---

[11] Miguel's mother, with whom they had been living, objected to their drinking and finally told them to move out in mid-2020.

14

Miguel maintains that the court erred by not continuing reunification services beyond the 12-month period specified by section 366.21, subdivision (e)(3), or by not continuing the hearing under section 352. We review the juvenile court's decision to terminate reunification services for substantial evidence, resolving all evidentiary conflicts in favor of the court's determination. (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.)

As the court explained in *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836 (*Tonya M.*), the Legislature added subdivision (e)(3) to section 366.21[12] in 1995 to address a specific problem. "Existing law failed to 'differentiate between the status needs of the very young child with limited parental relationship and that of the older child who has more of an ongoing parent-child and community relationship. As a result, infants and toddlers [had to] remain in foster care for at least one year, even if the parents [made] no concerted effort to re-unify.' [Citation.] Moreover, '[m]ost cases receive[d] re-unification services for the maximum 18 months.' [Citation.] A central purpose of Assembly Bill No. 1524 was to establish a second, expedited track for children under three years of age. As the bill's sponsor, the California Department of Social Services, had argued, 'very young children entering the public foster care system require a more timely resolution of a permanent plan because of their vulnerable stage of development. [The sponsor] believes that, given the unique developmental needs of infants and toddlers, moving to permanence more quickly is critical.' [Citation.]" (*Id.* at p. 846.)

For a dependent child under three years old in foster care, the 12-month review hearing is a watershed event. This review makes a critical determination – return

---

[12] Section 366.21, subdivision (e)(3), provides, "If the child was under three years of age on the date of the initial removal, . . . and the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to Section 366.26 within 120 days. If, however, the court finds there is a substantial probability that the child, who was under three years of age on the date of initial removal . . ., may be returned to his or her parent . . . within six months or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency hearing."

the child to the parent or end services and set up the hearing for what could turn out to be termination of parental rights and adoption. (See § 366.21, subd. (g)(4).) If, but only if, the permanent plan at 12 months is the return of the child and his or her safe maintenance in the home *and* there is a substantial probability that the child will be returned to the parent within another six months, then "court-ordered services may be extended up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical custody of the child's parent . . . ." (§ 361.5, subd. (a)(3)(A).)

In this case, the 12-month review was overdue. Substantial evidence of Miguel's present unreadiness to provide a safe home for Michael and of his failure over the course of a year to conscientiously comply with the reunification services and with visitation supports the juvenile court's decision not to extend the time for services past the 12-month cutoff. As the court stated in *Tonya M.*, a very young child needs permanency more quickly than an older child.

After reviewing the evidence in this case, the juvenile court determined that, based on Miguel's past performance, it could not foresee a substantial probability of a significant change in the near future, as required by the statute. "[T]here's not a substantial likelihood at this point that there's any justification for continuing with services." Nevertheless, the court gave C.B. and Miguel a compassionate last chance to show they could safely care for Michael when it ordered a "soft .26." Under applicable law, this was the most it could do. The failure here was not the court's.

Miguel also argues that the court erred by not granting a continuance of the section 366.21 hearing under section 352.[13] Putting aside the fact the court did not have a

---

[13] Section 352 provides in pertinent part, "(a) [¶] (1) Upon request of counsel for the parent, guardian, minor, or petitioner, the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that a continuance shall not be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements. [¶] (2) Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance."

motion under section 352 before it[14] – and therefore no showing of good cause – we note that the court did consider continuing the hearing and decided against it. We review an order denying a continuance for abuse of discretion. (*In re V.V.* (2010) 188 Cal.App.4th 392, 399.)

Before granting a continuance, a court must "give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (§ 352, subd. (a).) The juvenile court clearly gave considerable thought to Michael's best interests. It decided that, in light of his parents' "lack of engagement" with their services, his best interest was served by the "soft .26," which left the door ajar should the parents choose to walk through it, while focusing on Michael's needs, instead of dragging the permanency planning process out further. We cannot say the court abused its discretion in making this determination or any other in this case.

## DISPOSITION

The petition is denied on the merits.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

GOETHALS, J.

---

[14] "In order to obtain a motion for a continuance of the hearing, written notice shall be filed at least two court days prior to the date set for hearing, together with affidavits or declarations detailing specific facts showing that a continuance is necessary, unless the court for good cause entertains an oral motion for continuance." (§ 352, subd. (a)(3).)